IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EDWARD HEWITT MACDONALD,       §
TDCJ-CID NO. 1360050,          §
                               §
          Petitioner,          §
                               §
v.                             §      CIVIL ACTION NO. H-09-2767
                               §
RICK THALER,                   §
Director, Texas Department of  §
Criminal Justice, Correctional §
Institutions Division,         §
                               §
          Respondent.          §

**MEMORANDUM OPINION AND ORDER**

Edward Hewitt MacDonald, an inmate of the Texas Department of
Criminal Justice - Correctional Institutions Division (TDCJ-CID),
filed a federal Petition for a Writ of Habeas Corpus by a Person in
State Custody under 28 U.S.C. § 2254 challenging a state court
conviction.  The Respondent has filed a Motion for Summary Judgment
(Docket Entry No. 12) supported by State Appeal and Habeas Records.
The court will grant the motion and dismiss this Petition.

**I.   Procedural History**

A jury convicted MacDonald of sexual assault and sentenced him
to twenty-five years' imprisonment.  State v. MacDonald,
No. 1046437 (230th Dist. Ct., Harris County, Texas, March 8, 2006).
MacDonald filed a notice of appeal challenging the conviction.
MacDonald's appellate counsel argued on appeal that "[t]he evidence

was factually insufficient to establish that [MacDonald] committed sexual assault as alleged in the indictment." MacDonald v. State, No. 01-06-00235-CR (Appellant's Brief at 12). The Court of Appeals for the First District of Texas affirmed the trial court's judgment. MacDonald v. State, No. 01-06-00235-CR, 2007 WL 2130943 (Tex. App. -- Houston [1st Dist.] July 26, 2007). The same ground was presented in a petition for discretionary review (PDR) before the Texas Court of Criminal Appeals. The Court of Criminal Appeals refused MacDonald's PDR on December 19, 2007. MacDonald v. State, No. PD-1550-07.

On December 5, 2008, MacDonald filed a state application for a writ of habeas corpus pursuant to Article 11.07 of the Texas Code of Criminal Procedure. His State Habeas Record (SHR) includes the following grounds for relief:

1. Prosecutor misconduct (SHR at 07-09) by

   bolstering the victim's testimony during final argument;

   misstating the victim's relationship to men during final argument;

   falsely asserting during final argument that MacDonald "dragged his son into the courtroom"; and

   making false promises to MacDonald regarding dismissal of charges or a "no bill" from the grand jury in return for MacDonald's testimony.

2. Insufficient evidence (SHR at 10-11) because

   there was evidence that the victim was unchaste and a drug user;

the only evidence that the victim was a lesbian was
her testimony alone and there was no proof that she
did not like men;

the DNA report was not signed nor was there any
identifying name or tag to prove that it had been
tested;

Dr. Andel Gindy testified that there was no forced
entry or injury to the victim;

the victim admitted that she had been drinking and
using drugs; and

in his closing statement, the prosecuting attorney
impeached the complaining witness.

3.   MacDonald's trial counsel was ineffective because
he failed to (SHR at 12-15)

object to or preserve for error the prosecutor's
misconduct;

interview any witnesses or investigate the eight
phone calls made or received during the alleged
assault;

call any witnesses that would have assisted in
MacDonald's defense;

preserve any of the prosecutor's errors;

obtain the complaining witness's blood alcohol or
drug level;

investigate the victim's record of prior arrests,
drug abuse, or false accusations;

object to the admission of the unsigned DNA report;

subpoena MacDonald's initial arrest video;

seek admission of the complainant's clothes to show
that they were not torn or blood stained;

object to the introduction of maps introduced in
violation of the hearsay rule;

investigate MacDonald's prior convictions;

-3-

object to the prosecutor's interview of MacDonald;

object to the complainant's trial testimony that she was "fighting for [her] life" when no such statement had been previously made prior to the trial;

obtain photographs of complainant after the incident or other evidence demonstrating that there was no fight;

prepare for or take notes during voir dire;

prevent or object to the court's bias;

interview MacDonald for more than one hour;

object to the judge's inflammatory comments during voir dire;

investigate evidence regarding the complainant's past sexual activity; and

investigate the condoms found in the complainant's car.

3.   MacDonald was denied effective counsel on appeal because only one error was raised in the appellate brief and in the PDR.

4.   The trial judge engaged in misconduct by (SHR at 16-17)

expressing her personal opinion during voir dire regarding MacDonald's guilt or innocence;

not allowing MacDonald's defense counsel to cross-examine the complainant; and

denying MacDonald the right to testify in his behalf by requiring him to answer questions only with a yes or no while allowing the complainant to answer freely.

5.   MacDonald was denied due process and a fair and impartial trial because (SHR at 18-19)

the prosecutor injected an improper argument;

-4-

the evidence was insufficient to support a conviction;

no one investigated the eight phone calls that occurred during the incident;

no one from Microsoft testified regarding the accuracy or reliability of the maps used at trial; and

MacDonald was denied effective assistance of counsel.

6.  MacDonald was not provided a complete set of court records on appeal because the following were lost or missing (SHR at 20):

pages 149, 177, and 303 of the transcript;

juror information cards;

court's admonishment to MacDonald during trial (court's record only indicates that the judge spoke to him while the jury was out of the room); and

the reading of the jury charge during the punishment phase.

The Court of Criminal Appeals denied the habeas application without a written order on findings of the trial court without a hearing.  Ex parte MacDonald, No. 71,881-01 (Tex. Crim. App. May 13, 2009).  MacDonald filed the instant habeas petition with this court on August 24, 2009.

## II.  **Facts Established at Trial**

Due to the nature of MacDonald's claims, a review of the facts established during the state trial would be useful in evaluating the Petition and the Motion for Summary Judgment.  The opinion of the First Court of Appeals included a detailed account of the

-5-

evidence presented at trial, which the respondent copied verbatim in the Motion for Summary Judgment. See Docket Entry No. 12, at 3-10; MacDonald v. State, 2007 WL 2130943, 1-5. To avoid repetition and for the sake of providing a more cohesive analysis of the facts, the court makes the following summary of the trial evidence (See Trial Record [TR], Volumes 3-4.):

The complainant, Sheila Jares, met MacDonald at a bar called Lola's sometime after midnight on October 31, 2005. Previously, she and her girlfriend had been at a Halloween block party where she had four or five alcoholic drinks. After leaving the party, Jares returned home, had a glass of wine, and then went to Lola's to buy cocaine. However, Jares did not see her cocaine dealer at Lola's so she ordered a drink at the bar where she encountered MacDonald. The two were not acquainted with each other but conversed in a friendly manner, and MacDonald gave Jares a business card with his name and phone number on it.

Jares admitted at trial that she had consumed six or seven drinks during the course of the evening that the assault occurred, but she testified that it was not unusual for her to drink that much and that she felt clear-headed and that her memory was not impaired that night. (TR Vol. III at 195-96) Jares, realizing that her dealer was not going to show up and thinking that MacDonald was trustworthy, asked him if he knew where she could get some cocaine. MacDonald answered that he might be able to help her

if he could make a telephone call and if she would give him a ride.
MacDonald made the call confirming the deal, and Jares agreed to
take him to the location for the transaction.   Each of them paid
$25.00 for about a gram of cocaine.   (TR Vol. III at 198)   They
immediately left after making the purchase.   The complainant called
her friend, Mark Ziefchek, who invited her to come to a party at
his warehouse.   (Ziefchek would call back more than a half-dozen
times during that night, and on several occasions, Jares would
answer her phone and speak with him.   Id. at 242.)   Jares mentioned
the party to MacDonald who expressed his interest but asked if they
could first stop at his storage unit so he could get some more
money.   Id. at 200.

Jares then drove MacDonald to a gated but poorly lit storage
facility where she parked her car, which she described as a two-
door, full-sized car with a console between the driver and
passenger seats.   While Jares remained in the driver's seat and
made another phone call, MacDonald made a comment with sexual
overtones.   Although the two had been previously drinking and, by
this time, had used cocaine together, Jares was "kind of shocked"
and told MacDonald that such a comment was inappropriate.   (TR
Vol. III at 207)   However, Jares did not feel threatened, and joked
that she would "kick [his] ass" when he made a second suggestive
comment.   Id. at 208.   MacDonald responded by immediately lunging
over the console at Jares and opening her door.   This caused both

-7-

of them to tumble out of the car onto a grassy area; Jares landed on her back with MacDonald on top of her.  Id. at 208-210, 220. Jares tried to free herself by using her legs to move backwards, but MacDonald pinned her with his forearm although he did not strike her.  Jares, angry but hoping that she could get away, cursed at MacDonald and told him that she and the patrons at Lola's knew who he was.  MacDonald told her to stop struggling or that she would make things worse for her.  Jares became more enraged and fought harder; however, when she realized that she was isolated and at a serious disadvantage she then began to fear that she could be murdered.  MacDonald told her that he did not want to do anything other than have sex with her.

MacDonald then pulled off Jares's pants and performed oral sex on her vagina.  Id. at 220-21.  Jares, still feeling angry, began to cry but was unable to get away because MacDonald's arms were holding her legs.  Further, she did not try to escape because she was naked from the waist down and did not think that she could get away, and any attempt to run would make matters worse for her.  Id. at 221-22, 225.  MacDonald continued using his mouth to sexually assault Jares for approximately 30 minutes taking intermittent breaks from the ravishment in order to talk to her and apologize for his behavior.  Id. at 223.  Jares, being partially unclothed, responded that she was freezing and asked for her pants.  When MacDonald refused, Jares then suggested if they could at least

-8-

climb back into her car, and he agreed after several requests.  Id. at 225.  Although Jares had become submissive, she was still trying to think of a way in which she could manage to escape.  Id. at 226. One plan was to coax MacDonald to go around to the passenger side of the car, giving her an opportunity to get away.  Id.  However, MacDonald did not fall for her ruse but roughly told her to "stop f---ing around" and pushed her through the driver's door into the backseat of the car.  Id.

MacDonald got into the backseat with Jares and began apologizing again for his behavior although refusing her request for the return of her pants.  Id. at 228-29.  Jares inquired about going to her friend Mark's party to which MacDonald gave an affirmative response; however, he then resumed his sexual assault on her using his mouth.  Id. at 229-30.  At some point during the episode, MacDonald undid his pants and began to masturbate but was unable to achieve an erection, probably due to his cocaine use. Id. at 231-32.  Apparently frustrated with his inability to arouse himself, MacDonald invoked Jares's help, which she declined to give.  Id.  MacDonald then grabbed her by the neck forcing her mouth to come into contact with his penis, much to her disgust. Id. at 233.

Although Jares did not believe that MacDonald was ever able to get an erection, he did manage to use his penis to penetrate her vagina, without her consent, and assaulted her in that manner.  Id.

-9-

at 236-237.  MacDonald finally ceased molesting Jares just before dawn.  Id. at 238.  When he was finished, MacDonald put his head in his hands and made contrite statements how he did not intend for this to happen, primarily to himself.  Id.  He then asked Jares if she would drive him back to his truck.  Id. at 238-39.

Although it was apparent that MacDonald was done with his molestation, he still had Jares's keys.  Jares, unsure if the assault was over, agreed to take MacDonald back and tentatively reached for her pants.  Id. at 239.  The two individuals climbed back into the front of the car, got dressed, and Jares drove MacDonald back to Lola's.

Jares testified that the two engaged in small talk on the return drive and that MacDonald even gave her another card to make sure she had his number.  Id. at 242.  He then gave her his cell phone so that she could put her phone number on it.  Id. at 246.  Jares, not wanting to provoke MacDonald, feigned dialing her number on the phone and gave it back to him hoping that he would not discover her deception.  Id.

Jares further testified that she received phone calls from and spoke to her friend, Mark Ziefcheck, throughout the evening including the period in which she was being raped.  Id.  When asked about the content of their conversation, Jares answered that it was only small talk and did not concern the assault.  Id.  She explained that she did not tell Ziefcheck that she was in trouble

because she was afraid that MacDonald would react violently. Id. Jares did convey an oblique plea for help by reminding Ziefcheck of an instance when he saved her from drowning; however, Ziefcheck failed to comprehend the purpose of her story, and Jares gave up trying. Id. at 246.

When MacDonald finally left Jares at Lola's, she wrote down his license plate number. She then called Ziefcheck once again, this time revealing what had happened to her and emotionally breaking down. Id. at 253. Afterwards, she phoned 911 to report the assault. The police interviewed Jares while she was at a car wash near Lola's, and she briefly described what happened to her. Id. at 260. Jares later went to a hospital for a rape examination, which took three hours and required her to give samples such as hair and saliva. Id. at 266-67. A forensic DNA analyst testified during the trial that a sperm sample taken from Jares's vagina was tested and had a DNA profile that closely matched that of MacDonald's, indicating that there was less than one chance in one hundred thousand that another person could have contributed to the sample. Id. at 149.

With regard to the violence of the assault, Jares admitted that MacDonald never slapped or hit her; nor did he say that he would strike her or threaten her with a weapon. Id. at 290. However, Jares asserted that she never gave any indication she consented to having sex with MacDonald and that she resisted him

-11-

forcefully by screaming and kicking at him.  Id. at 271, 289.
Moreover, she begged him to stop and cried often.  Id. at 271.
Jares asserted that any sexual act she did with MacDonald was
involuntary and that she only submitted to him in order to avoid
serious harm or possible death.  Id.

Dr. Andel Gindy, the examining physician, assisted by Nurse
Angela Adolph, reported that there were no injuries to Jares's
genitalia.  Id. at 63.  He did confirm that there was sperm found
in the specimen indicating that intercourse had taken place.  Id.
at 66.  Dr. Gindy went on to explain that sexual intercourse can
occur without injury regardless of whether the act was consensual
or not.  Id. at 64. He also testified that he saw bruises and
abrasions, mainly on Jares's back.  Id. at 66.  The hospital also
photographed Jares and documented bruises and scratches to her back
and buttocks, which Jares attributed to her struggle with
MacDonald.  Id. at 267-68.

Nurse Adolph testified that she also observed fresh scrapes on
Jares's back and buttocks as well as fresh bruises on her right
forearm, wrist, and thigh.  Id. at 49-54.  Adolph further testified
that Jares smelled of alcohol when she was examined, but did not
otherwise appear intoxicated.  Id. at 48.  She also testified that
Jares was shaky, withdrawn, but cooperative.  Id.  Moreover, Jares
was frank and forthright when providing information during the
examination, including her use of cocaine that night.  Id.

-12-

On November 7, 2005, Houston Police Sergeant Bobby Roberts, who was assigned to investigate sex crimes at that time, interviewed Jares about the assault. Id. at 77-79. Jares gave a lengthy, forthright statement about the incident leaving no detail out including her use of cocaine. Id. at 81. Sergeant Roberts testified that he had already developed a suspect based on the initial police report that included license plate information, which led to the registered owner of the vehicle driven by the suspect. Id. at 82-83. Sergeant Roberts used the information to develop a photo array that included six pictures of similar men including one of MacDonald. Id. at 83-84. He showed the array to Jares who positively identified MacDonald as her attacker. Id. at 86. Sergeant Roberts described Jares as being tearful, trembling, and pausing at times during the interview, but also being very candid. Id. at 86-87. Jares accompanied Roberts to the storage facility and showed him where the assault occurred. Id. at 87-102. Sergeant Roberts entered the storage shed at the site and found one of MacDonald's business cards. Id. at 104. Roberts also identified photographs taken of Jares when she came to his office on November 7. Id. at 108. He testified that the photos accurately depicted the scrapes and injuries on her body, consistent with her version of the events. Id. at 111.

MacDonald gave his version of the events that occurred during the night of October 31-November 1, 2005, confirming that the two

-13-

had sex but that the act was consensual.  He testified he was at
Lola's having a few drinks and playing pool that evening before
meeting Jares.  Volume 4, at 48.  After shooting pool, he was
sitting at the bar when Jares approached him looking depressed or
sad.  Id. at 49.  When he asked Jares, who appeared to be in a
hurry, what was wrong she answered that she was looking for some
cocaine and wondered if he knew anybody who could sell her some.
Id. at 49-50.  MacDonald answered that he might know somebody, and
he called an acquaintance.  Id. at 50.  After confirming that the
acquaintance had some cocaine for sale, the two left in Jares's car
to make the purchase.  Id. at 51-52.

Together MacDonald and Jares bought a gram of cocaine at the
acquaintance's house, each paying $25.00, and about five minutes
later, both snorted some of it.[1]  Id. at 52-53.  After leaving the
house, MacDonald asked Jares to take him to his storage unit to get
some more money so they could "party."  Id. at 53-54.  However,
when they arrived there he realized that he could not go inside his
unit because he had left the keys inside his truck.  Id. at 55.
Instead, they parked near the storage unit and "did some coke"
together.  The two discussed the complainant's lesbian sex life,
and the fact that it had been "a long time since she's been with a
man."  Id. at 56.  They both got out of the car "to get some fresh

---

[1]MacDonald explained that they would place a small amount of cocaine
on one of his keys and then inhale it through their nostrils.  This
is referred to as doing "bumps of coke."  Id. at 53.

air" and MacDonald smoked a cigarette while the two continued to talk. Id. He stated that they then began to embrace and kiss each other with Jares taking an aggressive role "like a nympho but real wild. . . ." Id. at 57. The two then sank to the ground where Jares, with MacDonald's help, removed her pants, and he performed oral sex on her. Id. at 59. MacDonald testified that Jares never told him to stop or quit; nor did she ever cry or scream. Id. at 58, 63. MacDonald also denied making any threats or telling Jares not to "make it worse than it already is." Id. at 58. He also stated that Jares appeared to be enjoying the experience and that he did not grab her by the wrist or force her into the car when they got back inside. Id. at 59.

When asked about how Jares behaved during intercourse, MacDonald answered that she was "real aggressive, kind of like, you know, moving around a lot." Id. at 63. When asked whether she appeared to enjoy the intercourse, MacDonald responded, "Most definitely." Id. at 64. When they were through, MacDonald got out of the car to put his clothes on. Id. He then smoked a cigarette and used the restroom beside the storage building about 15 or 20 feet from the car. Id. Meanwhile, Jares was still in the backseat, and her car keys were still in the ignition. Id. at 65. MacDonald testified that he saw that Jares had a bruise inside of her thigh, and one on her arm near her wrist. Id. He also testified that he never apologized to Jares and that Jares drove him back to his truck, which was parked near Lola's. Id. at 66.

During cross-examination, MacDonald stated that he felt that Jares was using him as a scapegoat and that Jares was framing him to avoid trouble with her girlfriend.  Id. at 104.  However, MacDonald also acknowledged that reporting the rape subjected Jares to unwanted attention and that it would have been easier to have not reported the crime.  Id. at 104-105.  On redirect, he explained that he felt that Jares made her accusation because "she's probably going to get kicked out of her relationship with her girlfriend because she had an affair with a heterosexual man."  Id. at 108.

### III.  MacDonald's Grounds for Relief

MacDonald asserts the following grounds for relief in his petition (Docket Entry No. 1, at 7-15 unless otherwise noted):

A.   There was insufficient evidence to support the conviction.

B.   The prosecutor committed misconduct and denied MacDonald due process by

   1.   bolstering the complainant's testimony during his closing argument;

   2.   making false promises to MacDonald that the grand jury would "no bill" him;

   3.   making misleading statements to the jury during his closing argument; and

   4.   failing to prove all elements in the indictment.

C.   MacDonald's trial counsel was ineffective because he failed to

   1.   object to prosecutor's misconduct;

-16-

2.   interview witnesses;

3.   call witnesses that could have assisted the defense;

4.   preserve errors made by the prosecution;

5.   investigate evidence including Jares's blood alcohol level, the eight phone calls made during the incident, and the condoms found in Jares's car;

6.   prevent the prosecution from interviewing MacDonald;

7.   investigate MacDonald's priors;

8.   object to the unsigned DNA report;

9.   subpoena the video of MacDonald made after his arrest;

10.   seek admission of Jares's clothes at trial to show that there was no struggle;

11.   object to the admission of maps at trial;

12.   effectively cross-examine Jares on prior inconsistent statements;

13.   take notes during or prepare for voir dire;

14.   prevent the court from being "one-sided";

15.   confer with MacDonald for more than one hour on two occasions prior to trial; and

16.   object to the judge's inflammatory comments prior to voir dire.

D.   The trial judge denied MacDonald due process by

1.   asserting her personal opinion during voir dire;

2.   denying MacDonald's attorney the right to question potential jurors concerning their beliefs about reasonable doubt;

3.      denying MacDonald the right to answer fully
and unabated his trial counsel's questions;
and

4.      abandoning her "neutral status in favor of the
State."

E.    MacDonald was denied a fair and impartial trial as
previously stated in the above grounds.

F.    MacDonald's appellate record was incomplete.

G.    The Texas Court of Criminal Appeals failed to issue
a written opinion when it denied MacDonald's state
habeas application.

## IV.    <u>Standard of Review and Applicable Laws</u>

MacDonald's petition for a writ of habeas corpus is subject to
review under the federal habeas statutes as amended by the
Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").
28 U.S.C. § 2254; <u>Woods v. Cockrell</u>, 307 F.3d 353, 356 (5th Cir.
2002); <u>Nobles v. Johnson</u>, 127 F.3d 409, 413 (5th Cir. 1997), <u>citing</u>
<u>Lindh v. Murphy</u>, 117 S.Ct. 2059, 2068 (1997).   A federal habeas
petitioner challenging a state court decision is not entitled to
relief unless the state court judgment

(1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly
established Federal law as determined by the Supreme
Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The 1996 AEDPA "modified a federal habeas court's role in
reviewing state prisoner applications in order to prevent federal

-18-

habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 122 S.Ct. 1843, 1849 (2002), citing Williams v. Taylor, 120 S.Ct. 1495, 1518 (2000). Habeas relief should only be granted where the state court decision is both incorrect and objectively unreasonable. Martin v. Cain, 246 F.3d 471, 476 (5th Cir. 2001), citing Williams, at 1521.

## V.  Analysis

### A.  Sufficiency of the Evidence

#### 1.  Legal Sufficiency

The respondent argues that this action should be dismissed for failure to exhaust state court remedies. Applicants seeking habeas relief under § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998). This means that the substance of each federal habeas claim must be fairly presented to the highest state court, in this instance the Court of Criminal Appeals, and the requirement is not satisfied if new legal theories or new factual claims are included in the federal application. Id.

To the extent that MacDonald argues that the evidence submitted at his trial was legally insufficient to support his conviction, the claim was not included in his direct appeal, which explicitly stated that "[t]he evidence was factually insufficient to establish that [MacDonald] committed sexual assault as alleged

in the indictment." MacDonald v. State, No. 01-06-00235-CR (Appellant's Brief at 12). Factual sufficiency of the evidence is distinguishable from legal sufficiency of the evidence under Texas law. See Young v. State, 283 S.W.3d 854 (Tex. Crim. App. 2009). In reviewing a claim that evidence is legally insufficient to support a judgment, "the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Young, 283 S.W.3d at 861, quoting Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). Factual sufficiency invokes a two-part test. The first part requires the court to determine whether the evidence, although legally sufficient, "is so weak that the jury's verdict seems clearly wrong and manifestly unjust." Battise v. State, 264 S.W.3d 222, 226 (Tex. App. -- Houston [14th Dist.] 2008). The second part requires the court to ask whether "the jury's verdict, although legally sufficient, is nevertheless against the great weight and preponderance of the evidence." Id. In conducting a factual sufficiency review, an appellate court views all of the evidence in a neutral light. Id.

A legal sufficiency claim was not presented in MacDonald's PDR, and it has been long established that challenges to the sufficiency of the evidence cannot be presented in a state habeas application. Ex parte Grigsby, 137 S.W.3d 673, 674 (Tex. Crim.

-20-

App. 2004); Ex parte Christian, 760 S.W.2d 659, 660 (Tex. Crim. App. 1988); Ex parte Easter, 615 S.W.2d 719, 721 (Tex. Crim. App. 1981). Therefore, MacDonald's challenge to the legal sufficiency of the evidence is procedurally barred. Renz v. Scott, 28 F.3d 431, 432 (5th Cir. 1994). MacDonald has failed to demonstrate cause and prejudice or that failure to consider the claim would result in a fundamental miscarriage of justice, which would overcome the default. Morris v. Dretke, 413 F.3d 484, 491-92 (5th Cir. 2005).

### 2.   Factual Sufficiency

As stated above, a factual sufficiency challenge differs from a legal sufficiency challenge by going beyond questioning whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Battise, 264 S.W.3d at 226. The authority for such a review derives from state law and not federal constitutional law. See Clewis v. State, 922 S.W.2d 126, 129-130 (Tex. Crim. App. 1996). See also Woods v. Cockrell, 307 F.3d 353, 358 (5th Cir. 2002) ("The Texas Court of Criminal Appeals has ruled that the Texas constitution imposes a requirement for an appellate court to review the factual sufficiency of the elements of an offense that is more stringent than that imposed under the United States Constitution's due process clause."), citing Clewis at 129-130. When reviewing a challenge to the sufficiency of the evidence in a criminal conviction a federal

-21-

habeas court applies only the <u>Jackson v. Virginia</u> standard of proof, even if the state courts require a higher standard. <u>Pemberton v. Collins</u>, 991 F.2d 1218, 1224 (5th Cir. 1993). MacDonald's factual sufficiency claim will be denied because it does not involve a right established by federal constitutional or statutory law. <u>See also</u> <u>Woods</u>, 307 F.3d at 358 (Texas constitutional standard for the factual review of the elements of a crime cannot be utilized in a federal habeas proceeding, only federal standard).

**B.  Prosecutor Misconduct**

MacDonald alleges that the prosecutor misled him and made false promises regarding a "no bill" from the grand jury.  He also alleges that the prosecutor committed misconduct when he misled the jury and bolstered the complainant's testimony during final argument.  In addition, MacDonald argues that the prosecutor's failure to prove all of the elements of the offense constitutes misconduct.

When considering a claim of prosecutorial misconduct the court must determine whether the alleged misconduct was "'of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 107 S.Ct. 3102, 3109 (1987); <u>see also</u> <u>Kutzner v. Johnson</u>, 242 F.3d 605, 609 (5th Cir. 2001) (The court must decide whether the prosecutor's actions "so infected the trial with unfairness as to make the conviction a denial of due

process."). A trial is not considered fundamentally unfair unless it is shown that "there is a reasonable probability that the verdict might have been different" had the misconduct not occurred. Barrientes v. Johnson, 221 F.3d 741, 756 (5th Cir. 2000).

The state habeas court considered and rejected the allegation that the prosecutor promised that MacDonald's case would be no billed. SHR at 100, 103. This finding was based on an affidavit submitted by MacDonald's trial attorney in which he unequivocally stated that the State never promised MacDonald that his case would be dismissed if he testified. SHR at 76. A federal habeas court must presume the underlying factual determinations of the state court to be correct unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Miller-El v. Cockrell, 123 S.Ct. 1029, 1042 (2003). MacDonald has not presented any such evidence.

The state habeas court held that MacDonald's other claims of prosecutorial misconduct were procedurally defaulted because they were not raised on direct appeal. SHR at 99-100. "[P]rocedural default occurs where a state court expressly bases its dismissal of a claim on an independent and adequate state procedural ground." Moore v. Quarterman, 534 F.3d 454, 463 (5th Cir. 2008), citing Coleman v. Thompson, 111 S.Ct. 2546, 2557 n.1 (1991). Federal courts are precluded from granting claims for habeas relief when such claims have been rejected by the state courts based on state-law procedural grounds. Cotton v. Cockrell, 343 F.3d 746,

-23-

754 (2003).  "This doctrine ensures that federal courts give proper respect to state procedural rules." Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997), citing Coleman, 111 S.Ct. at 2565; see also Edwards v. Carpenter, 120 S.Ct. 1587, 1590 (2000) (finding the procedural default doctrine to be "grounded in concerns of comity and federalism").

MacDonald may only overcome his procedural default by demonstrating cause and prejudice or that failure to consider the claim would result in a fundamental miscarriage of justice. Morris, 413 F.3d at 491-92.  Cause is demonstrated by establishing that some objective external factor  impeded MacDonald's efforts to present his claim to the state courts.  Meanes v. Johnson, 138 F.3d 1007, 1011 (5th Cir. 1999).  Prejudice is established when a petitioner demonstrates "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Moore v. Quarterman, 534 F.3d 454, 463 (5th Cir. 2008), quoting United States v. Frady, 102 S.Ct. 1584, 1596 (1982).  The fundamental miscarriage of justice exception is confined to cases where the petitioner can show that he actually did not commit the acts for which he was charged; essentially, he must prove that he is innocent of the crime. Fairman v. Anderson, 188 F.3d 635, 644 (5th Cir. 1999).  MacDonald has failed to prove that he is entitled to these exceptions.

Prosecutorial statements are reviewed under a strict standard when a habeas petitioner alleges that they are improper. Dowthitt v. Johnson, 230 F.3d 733, 755 (5th Cir. 2000). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.   The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986) (internal quotations and citations omitted) (finding that a prosecutor's reference to the defendant as an "animal" was not a due process violation).  Apart from his unsupported statements, MacDonald has pointed to no evidence that proves that the prosecutor engaged in conduct that violated his due process rights.   Therefore, his claim of prosecutorial misconduct will be denied.

## C.   Ineffective Assistance of Trial Counsel

MacDonald argues that his trial counsel failed to provide effective representation. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI.  A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in Strickland v. Washington, 104 S.Ct. 2052 (1984).  To establish a successful ineffectiveness claim, a petitioner must show both constitutionally deficient performance by counsel and actual

-25-

prejudice as a result of counsel's deficient performance.  Id. at 2064.  The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. Green v. Johnson, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness.  Strickland, 104 S.Ct. at 2064.  In determining whether counsel's performance was deficient judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that the trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy.  West v. Johnson, 92 F.3d 1385, 1400 (5th Cir. 1996).  To overcome this presumption a petitioner must identify the acts or omissions of counsel that were not the result of reasonable professional judgment.  Wilkerson v. Collins, 950 F.2d 1054, 1065 (5th Cir. 1992).  However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  Strickland, 104 S.Ct. at 2066.  Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 2068.  The prejudice inquiry focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.  Lockhart v. Fretwell, 113 S.Ct. 838, 844 (1993). Unreliability or unfairness does not result if the ineffectiveness

-26-

does not deprive the defendant of any substantive or procedural right to which he is entitled.  Id.  In a habeas proceeding the petitioner has the burden of proving that his counsel was ineffective.  United States v. Chavez, 193 F.3d 375, 378-79 (5th Cir. 1999), citing Clark v. Collins, 19 F.3d 959, 964 (5th Cir. 1994).

In his state habeas application MacDonald alleged twenty-two acts in which his trial counsel was ineffective.  Ex parte MacDonald, No. 71,881-01 at 29-31.  In response the trial court ordered the trial attorney, Sam Maida, to file an affidavit summarizing his actions as counsel.  Id. at 56-57.  After reviewing Maida's affidavit (Id. at 74-78.) and referencing applicable case law, the state court included the following in its very thorough Findings of Fact and Conclusions of Law:

13.   The applicant fails to demonstrate, nor does he even allege, that any of the alleged failures to object would have resulted in trial court error, had the judge overruled the objections.

14.   The applicant fails to demonstrate that counsel's failures to object were unreasonable, and that but for the alleged deficiencies, a reasonable probability exists that the result of the proceeding would have been different.

. . .

16.   The applicant fails to allege the names of any witnesses that could have been favorable to the defense, and what their testimony would have been.

17.   The applicant fails to show that counsel's investigation of witnesses was deficient.

-27-

18. The applicant fails to show what further investigation would have revealed with respect to the phone calls.

19. The records reflect that the phone records were introduced at trial, and the name of the caller was identified. (3 R.R. 255).

20. The applicant fails to show that counsel's investigation into the phone calls was deficient.

21. The applicant fails to demonstrate that any toxicology was run on the complainant's blood immediately following the sexual assault.

22. The records reflect that the complainant's medical records were admitted as evidence at trial. (3 R.R. 45-46), See also from trial, State's Exhibit 5.

23. Both the complainant and the applicant testified consistently with regard to the complainant's use of drugs immediately preceding and during the sexual assault. (3 R.R. 195-196, 206-207, 276-278, 282-284, 4 R.R. 53, 55-56, 77, 87, 97).

24. The applicant fails to show that counsel's investigation of the complainant's alcohol and drug levels at the time of the offense was deficient.

25. The applicant fails to allege what further investigation of the complainant's background would have revealed.

26. The applicant fails to show that counsel's investigation of the complainant was deficient.

27. The applicant fails to demonstrate, nor does he allege, any specific errors in the enhancement paragraphs or that any misrepresentations were made concerning any part of the applicant's criminal history that was presented to the jury.

28. The applicant fails to show that counsel's investigation of the applicant's prior convictions was deficient.

29. The applicant fails to allege with any specificity what further investigation could or should have

-28-

been done with respect to the packaged condoms found in the complainant's car, as well as what any such investigation might have revealed.

30. The applicant fails to show that counsel's investigation of the condoms was deficient.

31. According to the credible affidavit of Sam A. Maida, counsel did receive and view a copy of the applicant's initial arrest video.

32. According to the credible affidavit of Sam A. Maida, counsel did made [sic] an audio copy of the applicant's initial arrest video and listened to it with the applicant.

33. According to the credible affidavit of Sam A. Maida, counsel did not believe it was necessary or beneficial to try to use the initial arrest video at trial.

34. According to the credible affidavit of Sam A. Maida, the applicant made statements on the initial arrest video that could have been detrimental to the defense.

35. According to the credible affidavit of Sam A. Maida, the applicant stated on the initial arrest video that he took the complainant to buy drugs because he wanted to get "laid."

36. The applicant fails to show that counsel's investigation and failure to use the initial arrest video at trial was deficient.

37. According to the credible affidavit of Sam A. Maida, counsel did not take any photos of the applicant at or near the time of his arrest to show the absence of injuries.

38. According to the credible affidavit of Sam A. Maida and supported by the probable cause affidavit, the complainant alleged that the applicant held her down and placed his forearm across her neck during the sexual assault, told her to calm down, and she stopped fighting.

39. According to the credible affidavit of Sam A. Maida, the absence of wounds on the applicant was not inconsistent with the assault as alleged.

-29-

40.  According to the credible affidavit of Sam A. Maida
     and supported by court records, counsel was not
     appointed to the instant case until ten days after
     the alleged offense.

41.  According to the credible affidavit of Sam A.
     Maida, even if the applicant had been injured by
     the complainant fighting him off during the
     assault, in ten days, any injuries could have
     healed.

42.  The applicant fails to show that counsel's
     investigation of and failure to take photos of the
     lack of any injuries on the applicant was
     deficient.

43.  The applicant fails to demonstrate that counsel's
     investigation into the instant offense was
     unreasonable, and that but for the alleged
     deficiencies, a reasonable probability exists that
     the result of the proceeding would have been
     different.

44.  According to the credible affidavit of Sam A.
     Maida, the applicant did speak with the State in
     counsel's presence because the applicant insisted
     that counsel was not doing enough for him, and
     demanded to speak to the prosecutor.

45.  According to the credible affidavit of Sam A.
     Maida, counsel was present for all of the
     conversation that took place between the applicant
     and the prosecutor, which took place in the
     holdover cell of the courtroom and did not last for
     more than several minutes.

46.  The applicant fails to show that counsel's
     agreement to allow the State to speak with the
     applicant at the applicant's request was deficient.

. . .

52.  According to the credible affidavit of Sam A.
     Maida, counsel wrote 6 pages of notes during voir
     dire.

53.  According to the credible affidavit of Sam A.
     Maida, counsel was not "generally confused" during
     voir dire.

-30-

54. According to the credible affidavit of Sam A. Maida, counsel's failure to take a note on juror 61 was the result of counsel paying more attention to members of the venire that had a greater chance of actually being seated on the jury.

55. According to the credible affidavit of Sam A. Maida and supported by court records, the last member of the venire actually seated on the jury was number 55.

56. The applicant fails to show that counsel's performance during voir dire was deficient.

57. According to the credible affidavit of Sam A. Maida, counsel visited with the applicant six or seven times in the holdover cell of the courtroom, and twice at the Harris County Jail.

58. According to the credible affidavit of Sam A. Maida, each of the two visits with the applicant at the Harris County Jail lasted four hours.

59. According to the credible affidavit of Sam A. Maida, before trial counsel discussed with the applicant what to expect from his direct examination and had him listed [sic] to the audio of his initial arrest tape to refresh his memory as to answers the applicant gave during his initial interview.

60. According to the credible affidavit of Sam A. Maida, before trial, counsel played "devil's advocate" and prepared the applicant for cross-examination.

61. According to the credible affidavit of Sam A. Maida, counsel believes the applicant was adequately prepared for trial.

62. The applicant fails to demonstrate that counsel's preparation and preparation of the applicant for trial were deficient.

63. According to the credible affidavit of Sam A. Maida and supported by the record, counsel did cross-examine the complainant regarding her statement in which she says she was "trying to stay alive."

-31-

64. According to the credible affidavit of Sam A. Maida, the complainant's response to counsel's cross-examination regarding her statement that she was "trying to stay alive" did not seem very credible to counsel.

65. According to the credible affidavit of Sam A. Maida, counsel did not want to give the complainant an opportunity to better explain or "clear up" the answer that counsel did not believe was very credible.

66. The applicant fails to demonstrate that counsel's cross examination of the complainant was deficient.

67. The applicant fails to demonstrate that counsel's preparation and trial performance was unreasonable, and that but for the alleged deficiencies, a reasonable probability exists that the result of the proceeding would have been different.

68. The representation of counsel received by the applicant at trial was sufficient to protect his constitutional right to reasonably effective assistance of counsel.

. . .

Ex parte MacDonald, No. 71,881-01 at 100-104.

This court affords the presumption of correctness to the state court's findings of fact and will not hold that they are erroneous unless MacDonald rebuts them with clear and convincing evidence. Galvan v. Cockrell, 293 F.3d 760, 763-64 (5th Cir. 2002). MacDonald has failed to do so. Moreover, this court has previously found that there is no showing that the prosecutor engaged in misconduct; therefore, any objection would have been pointless. See Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not obligated to raise futile objections). There is no showing that Maida should have objected to the DNA report, Jares's "trying

-32-

to stay alive" statement, the maps, the court's bias, or the judge's comments during voir dire. Such objections do not appear to be sound trial strategy and would have been of no avail for the defense. Consequently, Maida's failure to object was not deficient or prejudicial to MacDonald under the Strickland test. Green v. Johnson, 160 F.3d 1029, 1037-1038 (5th Cir. 1998).

The court views warily claims regarding uncalled witnesses. Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) (complaints of ineffective assistance of counsel based on uncalled witnesses are not favored in federal habeas corpus review because presentation of testimonial evidence is a matter of trial strategy and because allegations of what witnesses would have stated are largely speculative). MacDonald fails to show that there were witnesses whose testimony would have bolstered his defense, and his conclusory assertions do not support a finding that his attorney was ineffective. See Smallwood v. Johnson, 73 F.3d 1343, 1351 (5th Cir. 1996), citing Ross v. Estelle, 694 F.2d 1008, 1011-1012 (5th Cir. 1983).

MacDonald complains that his attorney was ineffective in failing to investigate: (1) the eight phone calls made or received during the crime, (2) the complainant's blood and alcohol levels, (3) the complainant, and (4) the condoms that were in the complainant's car. He also complains that his attorney failed to subpoena the video made of MacDonald after his arrest and did not take pictures of MacDonald when he was arrested to show that there

was no fight.   All of MacDonald's allegations are refuted by the
state court's findings based on Maida's affidavit.

The state court found that Maida reviewed the arrest video and
found that it was not helpful because, among other things,
MacDonald admitted during the interview that he agreed to help the
complainant because he wanted to have sex with her.   Ex parte
MacDonald, No. 71,881-01 at 102.   MacDonald's insistence that he
should have been photographed to show he had no injuries does not
support an ineffective assistance of counsel claim because the
absence of injuries would not have been inconsistent with the
complainant's account of the assault.   Id.   The eight phone calls
were discussed at trial and the caller was identified.   See 3 RR at
255.   Furthermore, MacDonald fails to show how his attorney was
deficient in failing to investigate or utilize the calls.   The
complainant's records were admitted at trial, but there is no
indication that toxicology tests were run on her during her rape
examination. 3 RR 45-46.   Moreover, the complainant admitted that
she was using alcohol and drugs that evening.   The record
demonstrates that MacDonald's attorney investigated the case, and
MacDonald has failed to show that his attorney failed to uncover
evidence pertinent to the case and how it would have helped him.
See Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002);
United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989).

MacDonald alleges that his attorney failed to take notes
during voir dire, that he did not confer with him for more than two

-34-

hours, and that he was not prepared for trial.  These assertions are refuted by the state habeas court's findings and the trial record, which reflect that Maida understood the facts and the applicable law during the trial.  MacDonald's conclusory assertions to the contrary do not support his claims.  Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990).  MacDonald also complains that his attorney failed to cross-examine the complainant regarding her testimony that she was fighting for her life.  In response to the claim made in the state habeas application, Maida explained in his affidavit that he cross-examined the complainant on her statement that she was fighting for her life when she shared cocaine with MacDonald.  Ex parte MacDonald, No. 71,881-01 at 77.  Her answer was that she did so "under duress."  Id.  Maida thought her answer was unconvincing and did not want to give her a chance to elaborate on it.  The court will not second guess a trial attorney's informed tactical decisions.  Crane v. Johnson, 178 F.3d 309, 313-14 (5th Cir. 1999), citing Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983).

MacDonald argues that his attorney was ineffective for allowing the prosecution to interview him.  Maida stated in his affidavit that MacDonald insisted on talking to the District Attorney so that he could convince him that he was not guilty of the offense.  Ex parte MacDonald, No. 71,881-01 at 75.  Maida further stated that the interview only lasted a few minutes in MacDonald's holding cell and that he was present throughout the

conversation. Id. The state court found that MacDonald failed to show that his attorney was deficient in complying with his request to speak with the prosecution. This court agrees. MacDonald cannot claim that Maida was ineffective for allowing him to talk to the prosecution after he demanded an opportunity to share his side of the story with the State. See Roberts v. Dretke, 356 F.3d 632, 638 (5th Cir. 2004) (a habeas petitioner cannot claim ineffective assistance of counsel when he blocks his attorney's efforts to defend him).

The state habeas court found that MacDonald failed to demonstrate any errors in the enhancement paragraphs or that any misrepresentations were made concerning his prior criminal history. Ex parte MacDonald, No. 71,881-01 at 101. Therefore, MacDonald's attorney was not deficient for failing to investigate his prior convictions. Id. The court also found that MacDonald failed to allege what further investigation of the complainant's background would have revealed and that his attorney was not deficient in failing to make such an investigation. Id. The court similarly found that MacDonald failed to specify what investigation could or should have been made regarding the condoms found in the complainant's car. Id. This court agrees that MacDonald's nebulous assertions that his attorney was deficient for failing to investigate his background, the complainant's background, or what was found in the complainant's car do not support a claim of ineffective assistance of counsel since MacDonald has failed to

-36-

even allege how his defense would have benefitted from such an investigation. Moreover, MacDonald fails to explain his claims concerning the DNA reports or the maps used at trial and what benefit an examination would have served. This court will not speculate as to what purpose investigations into the various matters would have served. Evans, 285 F.3d at 377.

MacDonald has failed to demonstrate that the state court's findings of fact and conclusions of law were contrary to, or an unreasonable application of, Supreme Court law regarding his claims. His ineffective assistance of trial counsel claim will be denied.

**D.   Due Process - Fair and Impartial Trial**

MacDonald complains that the trial court denied him due process as well as a fair and impartial trial. He asserts that the judge voiced her personal opinion during voir dire while not allowing his attorney to question venire members. He generally complains that the trial judge abandoned her neutral status and denied him the right to fully answer his attorney's questions.

MacDonald refers to an instance when the trial judge told the jury panel that a defendant is presumed to be innocent but adds, "It doesn't mean that he is," (2 RR 33) contending that the judge told the jury that MacDonald was guilty before the trial began. MacDonald fails to mention that the trial judge went on to instruct the jury that it must find him not guilty if the state did not

-37-

carry its burden of proof.  2 RR 33.  In its entirety, the court's
instruction is as follows:

> Now, because the burden of proof rests with the State and
> never shifts to the accused, a principle that goes hand
> in hand with that is the presumption of innocence.  Which
> means as Mr. MacDonald sits here right now, he is
> presumed to be innocent.  It doesn't mean that he is, but
> it means that you must afford him that presumption unless
> and until the State produces evidence that, one, you find
> to be credible and two, you find to be sufficiently
> credible that it convinces you of his guilt beyond a
> reasonable doubt.  So, because State has the burden of
> proof, it never shifts to the accused.  The accused is
> presumed to be innocent.

Id. at 32-33.

MacDonald also complains that the judge did not allow his
attorney to fully question a venire member about reasonable doubt.
The record reflects that the judge admonished MacDonald's attorney
that he could not inquire into a venireman's definition of
reasonable doubt.  Id. at 135.  Under Texas law jurors may form
their own definitions of reasonable doubt and cannot be struck for
cause due to the amount or type of evidence they believe necessary
to reach that threshold.  Murphy v. State, 112 S.W.3d 592, 598
(Tex. Crim. App. 2003).  MacDonald makes no showing how he was
prejudiced by the court's instructions or by the venire member's
failure to answer the question regarding reasonable doubt.
Therefore, this court finds no basis to grant relief regarding the
voir dire proceedings.  United States v. Garcia-Flores, 246 F.3d
451, 458 (5th Cir. 2001); United States v. Black, 685 F.2d 132, 134
(5th Cir. 1982).  Moreover, it does not appear that MacDonald

-38-

adequately exhausted his state court remedies regarding his claim that the court wrongly prohibited his attorney from questioning a juror about reasonable doubt.  Therefore, the claim would be barred from consideration on federal habeas review.  See Renz, 28 F.3d at 432.

The state court held MacDonald's claims regarding trial error were wholly conclusory and did not warrant habeas relief.  Ex parte MacDonald, No. 71,881-01 at 105.  This court finds that his claims that the trial judge abandoned her neutral status and denied him the right to answer his attorney's questions are not supported by any facts and are subject to denial.  See Smallwood v. Johnson, 73 F.3d 1343, 1351 (5th Cir. 1996).  MacDonald's arguments that he was denied a fair and impartial trial have no merit and will be denied for the reasons stated above.

## E.   Incomplete Appellate Record

MacDonald claims that the record on appeal was incomplete and that his due process rights were violated as a result.  He alleges that there was no transcription of his admonishment by the trial judge and the reading of the jury instructions.  However, MacDonald does not show how the absent portions of the transcript prejudiced his appeal, which only concerned the factual sufficiency of the evidence.  Therefore, MacDonald's claim regarding an incomplete transcript will be dismissed as meritless.  Mullen v. Blackburn, 808 F.2d 1143, 1146 (5th Cir. 1987).

**F.    State Habeas Error**

MacDonald argues that he is entitled to relief because the Texas Court of Criminal Appeals failed to issue a written opinion when it denied his state habeas application.  The state is under no constitutional obligation to provide post-conviction remedies, and any infirmities in state habeas proceedings will not support a basis for relief.  Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999); Millard v. Lynaugh, 810 F.2d 1403, 1410 (5th Cir. 1987). Therefore, the claim will be denied.

Based on the above findings and conclusions, the court concludes that the petition for a writ of habeas corpus filed in this action should be dismissed because MacDonald has failed to demonstrate that he is entitled to federal habeas relief.

## VI.    Certificate of Appealability

Under 28 U.S.C. § 2253, MacDonald needs to obtain a certificate of appealability before he can appeal the dismissal of his petition.  To obtain a certificate of appealability MacDonald must make a substantial showing of the denial of a constitutional right.  Williams v. Puckett, 283 F.3d 272, 276 (5th Cir. 2002).  To make such a showing he must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.  Lucas v. Johnson, 132 F.3d 1069, 1073 (5th Cir. 1998).  For the reasons stated in this

Memorandum Opinion and Order, MacDonald has not made a substantial showing of the denial of a constitutional right. <u>Newby v. Johnson</u>, 81 F.3d 567, 569 (5th Cir. 1996). The court will deny the issuance of a certificate of appealability.

## VII. <u>Conclusion</u>

The court **ORDERS** the following:

1.  Respondent's Motion for Summary Judgment (Docket Entry No. 12) is **GRANTED.**

2.  The Petition for a Writ of Habeas Corpus by a Person in State Custody filed by Edward Hewitt MacDonald (Docket Entry No. 1) is **DISMISSED with prejudice.**

3.  A Certificate of Appealability is **DENIED.**

**SIGNED** at Houston, Texas, on this 30th day of June, 2010.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-41-